IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

BARBARA FLETCHER, *et al.*,                  :

        Plaintiffs,

    v.                                              :        Case No. 3:16-cv-302

HONEYWELL INTERNATIONAL,                :        JUDGE WALTER H. RICE
INC.,

        Defendant.                                :

---

OPINION AND ORDER INCLUDING FINDINGS OF FACT AND
CONCLUSIONS OF LAW; JUDGMENT TO ENTER IN FAVOR OF
PLAINTIFFS AND AGAINST DEFENDANT; TERMINATION ENTRY

---

On behalf of themselves and other similarly situated retirees and their

spouses and other eligible dependents, Plaintiffs, Barbara Fletcher, Timothy Philpot,

Marcia Fink and Lucinda Smith, filed suit against their former employer, Defendant

Honeywell International, Inc. ("Honeywell").[1]  They challenge Honeywell's plan to

terminate healthcare benefits for those who retired from Honeywell's Greenville,

Ohio, plant.  Plaintiffs maintain that Honeywell promised them lifetime retiree

healthcare benefits, and that the proposed termination of such benefits breaches a

series of collective bargaining agreements ("CBAs").  They seek to enforce

Honeywell's promises under Section 301 of the Labor Management Relations Act

---

[1]  Although filed as a class action complaint, no motion for class certification was
filed.  Nevertheless, this does not alter the outcome, given that a verdict in favor
of the four named Plaintiffs will benefit all similarly-situated individuals.

("LMRA"), 29 U.S.C. § 185, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132.

Honeywell, however, denies that it agreed to provide lifetime retiree healthcare benefits. According to Honeywell, because the right to retiree healthcare benefits was not vested, any obligation to provide such benefits ended on May 22, 2014, when the last in a long series of CBAs expired.

On November 15, 2016, the Court issued a Decision and Entry overruling Honeywell's Motion to Dismiss. Doc. #29. That Decision and Entry, which contains a detailed discussion of the governing case law, including *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015) (abrogating *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983)), and *Gallo v. Moen, Inc.*, 813 F.3d 265 (6th Cir. 2016), *cert. denied*, 137 S. Ct. 375 (2016), is fully incorporated herein.[2]

In its Decision and Entry, the Court concluded that, because the language contained in the 2000-2003 CBA and subsequent CBAs was ambiguous concerning the parties' intent to vest retiree healthcare benefits, the Court would have to resort to extrinsic evidence to resolve the ambiguity. Rather than convert the motion to dismiss into a motion for summary judgment, the Court found it preferable to hold an evidentiary hearing and rule on the merits of Plaintiffs' claims

---

[2]  To the extent that the Court has already determined that the relevant contracts are ambiguous, and that extrinsic evidence is necessary to resolve the ambiguity, the Court sees no need to repeat a lengthy discussion of the holdings of these cases.

2

as soon as possible, given that the retiree healthcare benefits were, at that time, scheduled to be terminated on December 31, 2016.

Thereafter, Honeywell agreed to extend healthcare coverage through February 28, 2017, so that the Court had time to hold the hearing and issue its decision. The Court held the evidentiary hearing on January 30-31, 2017. Sharon Meadows, Edward "Buzz" Fink, Edward Bocik and Eric Warren testified at the hearing. In addition, the parties presented deposition testimony of Steve Shelton, Rick Hancock, Robert McKeage and Edward Thompson. The parties then filed post-hearing briefs. Docs. ##52, 53, 54, 55.

## I.    Discussion

This case concerns Honeywell's proposed termination of retiree healthcare benefits at its Greenville, Ohio, plant. On December 28, 2015, Honeywell notified Greenville retirees and their spouses that it intended "to terminate the retiree medical and prescription drug coverage currently provided to you and your covered dependents as of December 31, 2016." JX48.

Plaintiffs filed suit on behalf of themselves and other similarly situated retirees, alleging that Honeywell had promised them lifetime healthcare benefits, and that the proposed termination of those benefits violated the terms of a long series of CBAs. Honeywell admits that it promised to provide lifetime healthcare benefits to *surviving spouses and dependents* of Greenville retirees, but denies that it promised lifetime healthcare benefits to the *retirees themselves*.

3

Plaintiffs bear the burden of proving, by a preponderance of the evidence, that Honeywell agreed to provide those lifetime benefits. If the retirees have a vested right to healthcare benefits, Honeywell cannot unilaterally terminate those benefits; however, if there is no vested right, Honeywell was free to terminate retiree healthcare benefits upon the expiration of the final CBA. *Winnett v. Caterpillar, Inc.*, 553 F.3d 1000, 1008-09 (6th Cir. 2009).

For the reasons set forth below, the Court finds that Plaintiffs have satisfied their burden of proving that Honeywell agreed to provide lifetime healthcare benefits to its retirees.

### A.    Pre-2000 CBAs

Employer-employee relations at Honeywell's Greenville, Ohio, plant have been governed by a long series of CBAs spanning many decades. Prior to 2000, employees were represented by the Fram Employees Independent Union. Pre-2000 CBAs generally provided that Honeywell (or its predecessor companies) would pay the premium cost of single coverage for any retiree enrolled in the health care plan. Retirees who enrolled in family coverage were required to pay the difference in premium costs between single and family coverage. JX001-JX014.

It is undisputed that pre-2000 CBAs contain no language indicating that retiree healthcare benefits were vested, or that Honeywell was obligated to provide lifetime coverage to retirees or their family members. Trial Tr. at 84, 87. Honeywell maintains that its obligation to provide retiree healthcare benefits was

4

subject to the general durational clause contained in each CBA, and ended when the CBA expired.

Honeywell points out that the pre-2000 CBAS contain none of the provisions that the Court found, in later CBAs, to create an ambiguity concerning an intent to vest, *e.g.,* lifetime healthcare benefits to surviving spouses, or deferred caps on company contributions. Honeywell maintains that, because the language in the pre-2000 CBAs is unambiguous, it would be inappropriate to consider any extrinsic evidence of the parties' understanding of the duration of Honeywell's obligation to provide retiree healthcare benefits. Citing *Sprague v. General Motors Corp.*, 133 F.3d 388, 402-03 (6th Cir. 1998), Honeywell also argues that, absent any ambiguity, oral communications cannot be used to modify the terms of the written agreements.

If the Court were being asked to construe the language contained in the pre-2000 CBAs, these rules would certainly apply. However, the Court's *only* task in this case is to resolve the ambiguities contained in the 2000-2003 CBA and subsequent CBAs to determine the parties' intent, at the time of contracting, with respect to the duration of Honeywell's obligation to provide retiree healthcare benefits. To the extent that evidence of the parties' pre-2000 understanding of the duration of Honeywell's obligation to provide retiree healthcare benefits sheds light on the ambiguous language used in the 2000-2003 CBA and subsequent CBAs, such extrinsic evidence may be considered regardless of whether the pre-2000 CBAs are unambiguous.

Honeywell notes that Edward Bocik, now Vice President of Labor Relations for Honeywell, is the only witness who participated in negotiating any of the pre-2000 CBAs. Bocik was not the chief spokesperson, but was at the bargaining table for most of the negotiations for the 1989-1992 CBA. Trial Tr. at 198, 200. Bocik testified that there was no discussion at the bargaining table concerning lifetime retiree healthcare benefits, and it was his understanding that the company's obligation to provide healthcare coverage would expire when the CBA expired. *Id.* at 210, 213-215.

Bocik was not present at the bargaining table when the 1994-1997 or 1997-2000 CBAs were negotiated, but participated in a supervisory role. In setting the company's overall economic parameters for the negotiations, he operated under the assumption that Honeywell was obligated to provide retiree healthcare benefits only for the term of each contract. *Id.* at 220-21. According to Bocik, it would have been against company policy to provide lifetime retiree healthcare benefits. *Id.* at 227. Bocik testified that it was not his intent to confer lifetime healthcare benefits to retirees. Nor was he made aware of any unspoken understanding that healthcare benefits would be provided for the lifetime of each retiree at the Greenville plant. *Id.* at 224-25.

As explained below, Mike Rihm, Honeywell's Manager of Labor Relations at the Greenville plant, disagreed. Rihm, a long-time employee at the Greenville plant, had bargained on behalf of Honeywell and its predecessors in 1989, 1994, and

6

1997. *See* JX12, GR000660; JX13, GR000707; JX14, GR000760. It was his understanding that Greenville retirees had lifetime healthcare benefits.

### B.    2000-2003 CBA

#### 1.    Negotiation Preparation

In 2000, a National Labor Relations Board election was held, and the United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") became the new bargaining unit for the employees at the Greenville plant. Trial Tr. at 154. Sharon Meadows, an attorney and benefits consultant for the UAW, was assigned to assist with negotiations held after the election. *Id.* at 56.

At that point, the union was "very much in the dark about the existing benefits." *Id.* at 76. Meadows testified that, it was "unfortunate" that the 1997-2000 CBA was "very vague" and lacked "a lot of the basic information." *Id.* at 63. Likewise, Steve Shelton, the UAW's lead negotiator for the 2000-2003 CBA, testified that, because not all of the current practices had been put in writing, the scope of existing benefits was unclear. Shelton Dep. at 127, 176. The UAW sought to change this. *Id.* at 127; Trial Tr. at 63, 86.

Meadows decided that her first task was to determine the scope of existing benefits. Only then could she make recommendations for bargaining proposals. Trial Tr. at 62. After Honeywell failed to respond to her initial requests for information about existing benefits, she met with members of the UAW bargaining committee who told her that retirees at the Greenville plant had lifetime healthcare benefits. *Id.* at 87. Meadows then met with Mike Rihm, who verified this

7

information.  *Id.* at 64, 87-88.  Rihm, who is now deceased, was the person most

familiar with current practices at the Greenville plant.  *Id.* at 61, 88, 94.

Robert McKeage was Honeywell's labor relations representative and lead

negotiator for the 2000 contract.  McKeage Dep. at 12, 20, 128-29.  However, he

was not personally familiar with the existing benefits at the Greenville plant.  *Id.* at

80.  He repeatedly testified that if Meadows needed to clarify existing benefits,

Mike Rihm would have been an appropriate person to ask.[3]  *Id.* at  30, 80, 169-

170.  McKeage admitted that he was not aware of any specific conversations that

Meadows may have had with Rihm.  *Id.* at 33, 95-96.  McKeage also testified that

he and Rihm never discussed whether retiree healthcare benefits at the Greenville

plant were vested.  *Id.* at 150.

Rihm explained to Meadows that, with respect to healthcare benefits,

Honeywell paid the full premium for single coverage for all retirees.[4]  The retiree

could also elect healthcare benefits for his or her spouse and dependents, but was

---

[3]  Honeywell argues that Rihm was a "junior human resources employee," second-in-command to Bert Willingham, Trial Tr. at 156, and had no authority to bind Honeywell to any specific contract terms.  McKeage Dep. at 152-153, 159-160. Rihm, however, did not make any statement purporting to contractually bind Honeywell.  He simply told Meadows about his understanding of the scope of existing benefits at the Greenville location.  McKeage has admitted that Rihm was qualified to do so.

[4]  Rihm's statements to Meadows fall within the hearsay exclusion set forth in Federal Rule of Evidence 801(d)(2)(D).  The statements are offered against Honeywell, and were made by Rihm, a Honeywell employee, on a matter within the scope of that employment relationship and while it existed.  They are, therefore, admissible as non-hearsay.

responsible for the full cost of that additional coverage. When the retiree died, coverage for the family members would continue, but only if the spouse paid 100% of the cost. Trial Tr. at 66-67.

When Rihm told Meadows that Honeywell paid the full premium cost for single coverage for the retiree, she asked him "for how long?" Rihm responded, "until he dies or for his life or something to that effect." Meadows testified, "I can't tell you exactly which words he used because it's been 17 years but he clearly conveyed that it was for the life of the retiree and then he said upon the death of the retiree they continue to provide coverage for the surviving spouse." *Id.* at 100.[5] Meadows told Steve Shelton that Rihm had confirmed that retirees had lifetime healthcare benefits. Shelton asked her if she was absolutely sure; she said she was. *Id.* at 132-33. Meadows noted that this "changed things dramatically" in terms of how to proceed. *Id.* at 133.

Based on her discussions with Rihm and the members of the UAW bargaining team, Meadows created a chart to be used during negotiations. The first column listed current benefits, the second column listed the UAW's proposed changes, and the third column listed Honeywell's response. *Id.* at 68; Shelton Dep. at 185-86. With respect to *current* benefits, under the heading "Retiree

---

[5] Honeywell notes that Meadows admitted that Rihm's statements were in response to her inquiry about "current practices" at the Greenville plant as opposed to what was "contractually required" under the CBA. Trial Tr. at 88-90. In the Court's view, this is a distinction without a difference. The relevant fact is that, according to Rihm, the understanding at the Greenville plant was that Honeywell would provide lifetime retiree healthcare benefits.

Premium Sharing & Dependent Coverage," Meadows wrote, "Company agrees to pay the premium cost of single coverage for any retiree. To have family coverage for spouse and/or dependents, retiree must pay the difference in cost between single and family." Immediately below that, under the heading "Surviving Spouses of Retirees," she wrote, "[u]pon the death of a retiree, the Company continues coverage for the spouse and dependents for the life of the spouse provided 1) the retiree elected a joint & survivor form of benefit payment under the pension plan, and 2) the surviving spouse pays 100% of the cost of the coverage." JX22, at 3.

### 2. At the Bargaining Table

Meadows testified that it was "very unusual and deficient" that the Company did not contribute anything to the cost of healthcare coverage for the retirees' family members. Trial Tr. at 67. Therefore, this became one of the union's key proposals in the negotiations. The UAW proposed that Honeywell pay 50% of the cost of family healthcare coverage and, upon the death of the retiree, pay the full cost of healthcare coverage for the surviving spouse and dependents. JX22, at 3.

At the bargaining table, Steve Shelton asked Edward "Buzz" Fink, a Honeywell employee and member of the UAW bargaining committee, to explain the union's proposal. Fink explained that, after the retiree died, most spouses could not afford to pay the entire premium in order to continue healthcare coverage, so they were forced to drop the coverage. He said:

10

> [T]hat's not fair. We believe that the company should pay the 100
> percent cost for that spouse because that retiree had his healthcare
> until the day he died and provided that healthcare for that family his
> whole life. The time he worked and the time he retired. They [the
> family members] should enjoy that healthcare until they die.

Trial Tr. at 157.

Likewise, Sharon Meadows testified that, at the bargaining table, Fink

explained that the union wanted "the company to pay the benefits for the surviving

spouses for their lifetimes just like they paid the retirees' benefit for their lifetimes.

And he explained . . . that it was critically important to the retirees that their

spouses had the same thing that the retirees had." *Id.* at 137.[6] No one suggested

that the union was seeking something for the surviving spouses that the retirees,

themselves, did not already have. *Id.* at 137-38.

In the Court's view, Meadows, Shelton and Fink were all very credible

witnesses, and the Court gives their testimony on this topic a great deal of weight.

### C.    2000-2003 CBA Retiree Healthcare Provision

The UAW was largely successful in its efforts to obtain company

contributions for the cost of healthcare coverage for family members. With

respect to retiree healthcare benefits, Article XXXIV(1)(D) of the 2000-2003 CBA

provides that, "[e]ffective with all employees retiring on or after September 1,

2000, the Company will contribute 50% of the cost of the dependent portion of

retiree health care." JX15, at GR000795. Although certain caps were imposed on

---

[6]    Fink's statement, as repeated by Meadows, is not offered for the truth of the
matter asserted, but as evidence that the statement was made. Accordingly, it is
not hearsay.

Honeywell's contributions for *family* coverage, Honeywell agreed to "continue to pay for the full cost of medical for the retiree." *Id.* at GR000795-96.[7]

Article XXXIV(2)(E) then provides that "[u]pon the death of a retiree, the Company will continue coverage for the spouse and dependent children for their lifetime provided 1) the retiree elected a joint & survivor form of benefit payment under the pension plan, and 2) the surviving spouse pays 50% of the cost of family coverage." *Id.* at GR000796.

### D.  Discussion

Honeywell intends to honor its commitment to provide lifetime healthcare benefits to surviving spouses and dependents.  However, Honeywell denies that it agreed to provide lifetime healthcare benefits to the *retirees themselves*.

It is undisputed that there is no language in the CBA specifically imposing any such obligation on Honeywell.  Meadows, Fink and Shelton all testified,

---

[7]  Relying on *Gallo*, Honeywell argues that this language cannot be construed as implying an intent to vest.  In *Gallo*, the Sixth Circuit held that "[t]here would be no need to 'continue' such benefits if prior CBAs had created vested rights to such benefits."  813 F.3d at 270.  In contrast to the CBA at issue in *Gallo*, however, certain other provisions of Honeywell's CBA, *e.g.,* the surviving spouse provision, render the contract language ambiguous.  This opens the door for the Court to consider extrinsic evidence of the parties' intent concerning lifetime retiree healthcare benefits, including Plaintiffs' understanding of the language chosen by the parties.

Plaintiffs maintain that Honeywell's promise to "continue to pay the full cost of medical for the retiree" reflected the existing practice, and embodied the parties' understanding that Honeywell would continue to do what it had always done, *i.e.,* provide healthcare coverage for the lifetime of its retirees.   The Court finds that this interpretation is a reasonable one.  After all, absent a previous commitment to do so, Honeywell could not *continue* to pay for the full cost of medical for the retiree.

however, that they believe that Honeywell's promise to provide lifetime retiree healthcare benefits is clearly implicit in the retiree healthcare provisions of the 2000-2003 CBA.  Trial Tr. 110, 165-168; Shelton Dep. at 118-20.

Honeywell, however, argues that the Court cannot infer any such commitment from the language of the CBA, and insists that the Court limit Honeywell's obligations to the precise terms of the agreement.  According to Honeywell, the absence of specific language providing for lifetime healthcare benefits for retirees is crucial, particularly in light of the UAW's stated goal of wanting to make certain that all benefits were clearly set forth.  However, a "clear statement" that the company agrees to provide lifetime retiree healthcare benefits is not necessarily required.  Courts may draw "implications and inferences" from other language in the CBA.  *See Gallo*, 813 F.3d at 274.

Moreover, because the Court has already found that the contract language is ambiguous, it may look to extrinsic evidence to determine what the parties intended when they drafted the language in question.[8]  Given the evidence presented at the hearing, the Court finds that the CBA embodies the parties' understanding that Honeywell would provide lifetime healthcare coverage for its retirees.

---

[8]  Citing the rule of *contra proferentum*, both parties have urged the Court to resolve any ambiguity against the party that drafted this language.  However, given that *both* parties played a part in drafting this provision, application of this rule is unworkable.  Some of this language is derived from the chart created by Sharon Meadows; however, she testified that Honeywell is responsible for the final, modified language contained in the CBA.  Trial Tr. at 110.

It is undisputed that the UAW did not submit any proposal asking Honeywell to provide healthcare benefits for the lifetime of the retirees. The big question is "why not?" If we believe Honeywell, it is because the UAW knew that any such request would be *rejected*. If we believe Plaintiffs, it is because that particular benefit was *already* vested. For the reasons set forth below, the Court concludes that Plaintiffs have the more persuasive argument.

Honeywell argues that the UAW made a conscious decision not to request lifetime retiree healthcare benefits because the union knew that any such proposal would be rejected outright. In support, Honeywell cites to Steve Shelton's deposition testimony. Shelton testified that, as a union negotiator, he had been instructed to avoid asking for "lifetime" benefits, because if the company rejected the request, this would create a bad bargaining record that could be used against the union "down the road somewhere." Shelton Dep. at 133, 164-165. Honeywell surmises that the UAW "made the calculated decision to remain silent on the duration of retiree healthcare benefits, gambling that, if a dispute ever arose in the future, a Court would construe contractual silence in their favor." Doc. #52, PageID#2828.[9]

---

[9] In 2000, in reliance on *UAW v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983) and its progeny, courts within the Sixth Circuit regularly inferred that, absent extrinsic evidence to the contrary, retiree healthcare benefits were vested for life.
 In *Gallo*, the Sixth Circuit rejected the plaintiffs' argument that the CBAs incorporated "background understandings that favor lifetime vesting of retiree healthcare benefits. 813 F.3d at 272. Plaintiffs argued that, at the time the parties negotiated the CBA, *Yard-Man* was still good law and the parties would have assumed that these inferences were applicable. The Court noted that the

Plaintiffs, however, maintain that the UAW submitted no proposal for lifetime healthcare benefits for the retirees, because, as Mike Rihm had verified, this benefit was *already vested*. Accordingly, there was no need to "tiptoe" around the issue of lifetime benefits to avoid creating a negative bargaining history. The union felt free to ask Honeywell to extend similar "lifetime" benefits to the retirees' surviving spouses and dependents.

---

same could have been said in *Tackett*, yet "nothing in *Tackett* (or the concurrence) hints at the idea that *Yard-Man* would linger, vest as it were, as a precedent that would bind future interpretations of such agreements." Notably, the court in *Gallo* found that the language in the CBA unambiguously required the conclusion that no vesting had occurred. *Id.* at 274.

Given this finding, there would have been no need for the *Gallo* court to consider the non-relevant evidence of the law as it existed at the time of contracting; therefore, the above-referenced dicta in *Gallo* is not applicable here. Where, as here, the Court has found the language to be ambiguous and is looking to extrinsic evidence to resolve the ambiguity, it seems only logical that the law as it existed at the time of contracting is relevant in determining the parties' intent with respect to vesting. As Sharon Meadows testified, "lifetime" was not "a magic word in my mind at that time." Trial Tr. at 100. Accordingly, the Court takes issue with Honeywell's characterization of the UAW's "calculated decision to remain silent on the duration of retiree healthcare benefits." As previously discussed, Meadows, Fink and Shelton all believed that the CBA clearly expressed the parties' intent that Honeywell would provide lifetime healthcare benefits not only to the surviving spouses and dependents, but also to the retirees themselves. *Id.* at 110, 165-168; Shelton Dep. at 118-20.

Moreover, the fact that *Yard-Man* was still good law when the parties negotiated the 2000-2003 CBA may help explain why union negotiators, at least within the Sixth Circuit, were told never to explicitly ask for "lifetime" benefits. If such a request were rejected in negotiations, there would be a paper trail. In short, if a court later found the relevant contract language to be ambiguous, and looked to extrinsic evidence to resolve the ambiguity, any inference that retiree healthcare benefits were vested for life would be obliterated.

15

Plaintiffs contend that the parties' understanding that Honeywell already provided lifetime retiree healthcare benefits is manifest both in the chart that Meadows created, and in statements made by Buzz Fink at the bargaining table.

The chart that Meadows created, which memorializes existing practices at the Greenville plant, does not explicitly state that Honeywell provides healthcare benefits for the lifetime of the retiree. Nevertheless, Plaintiffs argue that this is implicit in the following statements: (1) "Company agrees to pay the premium cost of single coverage for any retiree. To have family coverage for spouse and/or dependents, retiree must pay the difference in cost between single and family"; and (2) "*Upon the death of a retiree*, Company continues coverage for the spouse and dependents for the life of the spouse . . . " JX22, at 3 (emphasis added).

Prior to bargaining, Meadows emailed this chart to certain Honeywell officials, asking them to indicate their agreement or disagreement with each of the proposals. JX21. The same chart was also passed across the bargaining table. Trial Tr. at 73. Shelton testified that all of the Honeywell negotiators saw it. Shelton Dep. at 134. McKeage, however, testified that he does not remember seeing it. McKeage Dep. at 46. At no time did anyone from Honeywell voice any objection to Meadows' characterization of existing benefits. Trial Tr. at 73-74. Steve Shelton testified that, because this was such an important subject, Honeywell surely would have objected if it disagreed. Shelton Dep. at 133-134. Given that Meadows' chart does not unambiguously state that Honeywell already

16

provided lifetime retiree healthcare benefits, the Court gives little weight to Honeywell's failure to object to the statements contained therein.

Nevertheless, the same cannot be said with respect to Honeywell's failure to object to statements that Buzz Fink made at the bargaining table while explaining the UAW's proposal. Fink specifically stated that the Greenville retirees already had lifetime healthcare benefits, and he asked that the same benefits be provided at no cost for the lifetimes of the surviving spouses and dependent children. Trial Tr. at 137-38, 157. Meadows and Fink both testified that none of the Honeywell negotiators voiced any objection to Fink's statement. *Id.* at 140, 157.

McKeage testified that he does not recall Fink making this statement, and does not remember anyone else from the UAW saying that they understood retirees to have lifetime healthcare benefits. McKeage Dep. at 45, 145. McKeage insisted that, if anyone had suggested that retiree healthcare benefits were vested for life, he would have clarified that "it was not really my authority to agree to any lifetime benefits with regard to retiree healthcare." *Id.* at 145. He further testified that, if the UAW had requested lifetime retiree healthcare benefits, "[t]he answer would have been no." *Id.* at 148-49.[10] McKeage testified that it was not

---

[10] Ed Bocik testified that any such agreement would have been contrary to company policy. Trial Tr. at 227. Nevertheless, other than attending an initial "meet and greet," Bocik was not present for negotiations for the 2000 CBA. *Id.* at 239. He admitted that he did know how the retiree healthcare benefit language came about or what the parties intended. *Id.* at 241-42.

17

his intent or his understanding that Honeywell would provide lifetime healthcare benefits to the retirees.  McKeage Dep. at 165-168.

Nevertheless, McKeage apparently had no qualms about agreeing to lifetime healthcare benefits for *surviving spouses and dependents*, although he and Bocik both testified that this provision was unique to Greenville.  Trial Tr. at 246; McKeage Dep. at 113.  Bocik could not explain why Honeywell agreed to this provision, given that it was inconsistent with corporate policy.  Trial Tr. at 245-46, 249.

Despite Honeywell's claims that this CBA provision is a complete aberration, Honeywell approved it with little hesitation.  In fact, McKeage testified that he does not even recall *discussing* the "lifetime" nature of healthcare benefits for the surviving spouses and dependents.  He remembers the discussion being focused solely on the percentage of Honeywell's contribution.  McKeage Dep. at 99-100, 117, 122.

The fact that Honeywell so willingly agreed to provide lifetime healthcare benefits to surviving spouses and dependents at the Greenville facility detracts from the credibility of its claim that it never would have agreed to provide lifetime healthcare benefits for the retirees themselves.[11]  In the Court's view, McKeage's

---

[11]  Honeywell urges the Court not to read too much into Honeywell's agreement to provide lifetime healthcare benefits to surviving spouses and dependents, given that this was a significantly smaller population than the population of retirees, and Honeywell agreed to pay only 50% of the cost.  Honeywell, however, presented no evidence that the population of surviving spouses and dependents is

18

failure to object to Fink's statement that the retirees already had lifetime healthcare benefits, and Honeywell's ready agreement to provide lifetime healthcare benefits to surviving spouses and dependents are quite telling.

The Court continues to believe that it is inconceivable that the UAW would bother to seek lifetime paid healthcare benefits for surviving spouses and dependents if the retirees themselves did not already have the same. In her concurring opinion in *Tackett*, Justice Ginsburg noted that a "survivor benefits" clause instructing that, if a retiree dies, her surviving spouse will continue to receive benefits, may be relevant to the question of whether retirees have a vested right to healthcare benefits. *Tackett*, 135 S. Ct. at 938 (Ginsburg, J., concurring). Moreover, the Sixth Circuit has noted that it is unreasonable to expect surviving spouses' benefits to exceed those of the retirees themselves. *Winnett v. Caterpillar Inc.*, 510 F. App'x 417, 420-21 (6th Cir. 2013).

In *UAW v. Loral Corporation*, 873 F. Supp. 57, 64 (N.D. Ohio 1994), *aff'd*, 107 F.3d 11, 1997 WL 49077 (6th Cir. 1997), the court found that it "defies common sense" to believe that the parties would agree to provide lifetime healthcare benefits for surviving spouses and dependents, but not extend the same

---

significantly smaller than the population of retirees, and the Court declines to make that assumption.

protection to the retirees themselves.[12] *See also Bidlack v. Wheelabrator Corp.*, 993 F.2d 603, 608 (7th Cir. 1993) (holding that a CBA promising to "pick up the full tab" for retirees' health insurance once they reach age 65, and promising that, upon the death of the retiree, the surviving spouse will continue to receive healthcare benefits, "could be thought a promise to retired employees that they and their spouses will be covered for the rest of their lives."); *Jansen v. Greyhound Corp.*, 692 F. Supp. 1029, 1036 (N.D. Iowa 1987) (finding it "inconceivable that the Defendants [] would maintain that they can reduce or terminate benefits for retirees at will when the contract specifies that a retiree's spouse shall have lifetime medical benefits.").[13]

Moreover, in light of Steve Shelton's testimony that he was cautioned never to ask for "lifetime" healthcare benefits in negotiations, it also defies common sense that the UAW would have been so bold as to specifically request "lifetime" healthcare benefits for surviving spouses if the retirees themselves did not already have them. The inference that logically follows is that, because the UAW was

---

[12]  As this Court noted in its November 15, 2016, Decision and Entry, even though *Loral* was decided long before *Tackett*, this does not necessarily preclude reliance on the basic "common sense" argument articulated therein. Doc. #29, PageID#956.

[13]  Honeywell cites to *Bouboulis v. Transport Workers Union of America*, 442 F.3d 55, 61-62 (2d Cir. 2006), in which the court held that a letter stating that upon the death of a retiree, insurance coverage would continue for the lifetime of the surviving spouse, did not necessarily constitute a promise of lifetime benefits for the retirees themselves. As Plaintiffs point out, however, *Bouboulis* is factually distinguishable in that it involved a unilaterally-drafted summary plan description rather than a bilateral CBA.

secure in its understanding that retiree healthcare benefits were already vested, it felt secure in asking Honeywell to extend the same protections to family members.

In the Court's view, evidence of the bargaining history of negotiations for the 2000-2003 CBA, standing alone, is more than sufficient to render judgment in favor of Plaintiffs. Nevertheless, subsequent events also support a finding that Honeywell agreed to provide lifetime retiree healthcare benefits.

## E.    2003 and 2008 Negotiations

The same basic provisions that were negotiated in 2000, governing healthcare coverage for retirees and their family members, remained in place in all subsequent CBAs; in 2003, however, Honeywell did agree to increase its contribution for family coverage from 50% to 60%. JX16, GR000863-864.

It is undisputed that there were no discussions during the 2003 or 2008 negotiations about the duration of retiree healthcare benefits. Steve Shelton testified that there would have been no reason to discuss it because the issue was already fully resolved. Shelton Dep. at 98. For the reasons set forth above, the Court finds Shelton's explanation to be credible.

According to Edward Thompson, neither were there any further discussions about the lifetime nature of the healthcare benefits that Honeywell had agreed to provide to surviving spouses and dependents. Thompson Dep. at 37-38, 130-31.[14]

_____

[14]    All citations to Thompson's deposition refer to his January 10, 2017, deposition. Although the parties also designated portions of a different deposition taken in 2012, this testimony was not presented at trial.

21

Thompson was Honeywell's Human Resources Director and chief spokesperson for the 2003 negotiations at the Greenville plant. In 2008, he supported the Greenville negotiations in his capacity as Labor and Employee Relations Director. *Id.* at 77, 82.

Plaintiffs argue that two other modifications in the 2003-2008 and 2008-2011 CBAs support a finding that retiree healthcare benefits were vested for life: (1) a provision for healthcare benefits for "deferred vested" retirees; and (2) a provision concerning caps on company healthcare benefit contributions. The Court agrees, but only in part.

In 2003, the union proposed a "30 and out" plan, whereby employees who had worked for thirty years could retire with full pension benefits. Trial Tr. at 280. Honeywell rejected this proposal, but agreed that "[e]mployees ages 50-55 with 30 years of service, who leave the company prior to becoming pension eligible, will be eligible for retiree health care benefits when they commence their pension benefits (age 55 or later)." JX16, GR000863.

This "deferred vested" provision was unique to the Greenville plant. Thompson Dep. at 56. Honeywell maintains that, although retirees would be *eligible* for healthcare benefits when they began collecting their pensions, the actual availability of healthcare benefits depended on the extent to which retiree medical benefits were still being offered at that point in time. Trial Tr. at 311.

Plaintiffs, however, argue that because health care benefits for these "deferred vested" retirees could commence long after the CBA expired, this

22

demonstrates the parties' intent that Honeywell would provide lifetime retiree healthcare benefits. According to Plaintiffs, it defies logic to suggest that healthcare benefits for regular retirees were subject to the general durational clause of the CBA, but healthcare benefits for "deferred vested" retirees could spring to life years after the CBA expired.

Although this argument fits nicely into Plaintiffs' theory of the case, the Court cannot consider it. In *Gallo*, the Sixth Circuit held that a provision tying *eligibility* for healthcare benefits to *eligibility* to pension benefits was insufficient to imply a promise to provide lifetime healthcare benefits. 813 F.3d at 272. Instead, there must be language tying the "*duration* of pensions to the *duration* of health benefits." *Id.* (emphasis added). No such language exists here. The mere fact that eligibility for retiree healthcare benefits is deferred until the retiree becomes eligible to collect a pension does not render this case meaningfully distinguishable from *Gallo*. Therefore, the Court must reject Plaintiffs' argument that the "deferred vested" provision implies an intent to vest.

The Court may, however, consider the import of the parties' agreement to cap Honeywell's contributions for retiree healthcare benefits. In 2003, the parties agreed as follows:

> The company will cap its health care contribution for those retiring on or after 01/01/2004 at its actual 2008 cost (or the actual cost for any year between 2003 and 2008 if greater). This cap will not take effect until 2009. In addition there will be no cap for retirees prior to 01/01/2004. The cap for those retiring on or after 01/01/2004 will be a mandatory subject of bargaining for all future negotiations.

23

JX16, at GR000863. Then, in 2008, the parties agreed to cap contributions at the actual 2011 cost, and extended the effective date of the cap to 2012. JX17, at GR000994.

Eric Warren was Honeywell's Director of Benefits, Labor and Retirement Plans from 2002 to 2009. In 2009, he became Honeywell's Director of Human Resources. Warren supported the 2003, 2008 and 2011 negotiations for the Greenville plant, drafting benefit proposals and analyzing the cost. Trial Tr. at 257-58. He explained that, because pension and retiree medical costs were so large, Honeywell spent a great deal of time deciding what proposals would be presented and determining the parameters of an acceptable economic outcome. *Id.* at 259-60.

According to Warren, the cap provision allowed Honeywell to take an immediate accounting gain, because projected expenses would be lower. It also gave the union the opportunity to re-negotiate the extent of the caps before they went into effect, making it more likely that the union would ratify the CBA. *Id.* at 268, 275, 278.

Plaintiffs maintain that the fact that the caps on healthcare contributions applied only to *future* retirees, and were not scheduled to go into effect until *after* the CBA expired, is evidence of the parties' understanding that retirees had vested lifetime healthcare benefits. The Court agrees.

It is undisputed that, in 2003, Honeywell initially proposed caps that would negatively affect *current* retirees, those who had retired on or after June 1, 2000.

24

*Id.* at 268, 300. Shelton, however, told Honeywell negotiators that it would be illegal to apply the caps retroactively. Shelton Dep. at 221; JX24, at 9. Likewise, Eric Warren remembered Sharon Meadows saying something about how the proposal would be against the law. Trial Tr. at 300-01. Plaintiffs maintain that, because the current retirees had a vested right to healthcare benefits, caps could be applied only to *future* retirees. *See Moore v Menasha Corp.*, 690 F.3d 444, 450 (6th Cir. 2012) (holding that vested healthcare benefits are "forever unalterable").

Honeywell subsequently agreed to the union's counterproposal, applying the caps only to employees retiring on or after January 1, 2004. Trial Tr. at 268, 296-97, 304, 321. In fact, Warren conceded that Honeywell agreed that all changes made in 2003 and 2008 to retiree healthcare benefits, *e.g.,* increases in prescription drug prices, would apply only *prospectively*. Trial Tr. at 297, 304, 321.

Nevertheless, Warren and Thompson denied that Honeywell's agreement to modify the proposal indicates that it agreed with the UAW's position that, because the rights were vested, caps could apply only to future retirees. They both testified that they believed that Honeywell had authority to apply the caps retroactively, but simply chose not to do so. Thompson Dep. at 26; Trial Tr. at 271.

Honeywell's proffered explanation for why it agreed to the UAW's counterproposal is somewhat muddy. Ed Thompson testified that Eric Warren

25

advised him that Honeywell agreed to apply the caps prospectively because it "would be too complicated" to fold in the current retirees, given that their retiree healthcare benefits had been negotiated by a different union. Thompson Dep. at 25-28. Nevertheless, Thompson could not recall why Warren believed that to be so. *Id.* at 29.

Tellingly, when asked at trial why Honeywell agreed to the UAW's counterproposal to apply the caps only to *future* retirees, Warren made no mention of the fact that the healthcare benefits for current retirees had been negotiated by a different union. Nor did he offer any alternative explanation for why Honeywell agreed to apply the caps only prospectively. Warren skirted the issue, stating only that the UAW's counterproposal "met our total financial bargaining parameters as approved by the company." He explained that, because of the ratio of retirees to active employees at the Greenville plant, the change in the effective date of the caps did not materially impact Honeywell's financial outcome. Trial Tr. at 273-75. *See also* Thompson Dep. at 25, 30.

In the Court's view, Honeywell's inability to offer a reasoned explanation for why it agreed to apply the caps only to future retirees lends support to Plaintiffs' argument that Honeywell knew that retiree healthcare benefits were vested and could not unilaterally be modified.

The fact that Honeywell also agreed that the caps on company contributions for healthcare benefits for future retirees would not take effect until after the CBA expired lends further credence to Plaintiffs' claim that these were lifetime benefits.

26

Warren testified that, in his view, the fact that the caps took effect after the CBAs expired does not imply an agreement to provide lifetime benefits. Trial Tr. at 276-77, 289. Citing *Tackett v. M&G Polymers, USA, LLC*, 561 F.3d 478, 482 n.1 (6th Cir. 2009), Honeywell argues that postponing the effective dates of these caps beyond the expiration of the CBA was a common industry practice in no way intended to imply that the company agreed to pay lifetime retiree healthcare benefits. However, even the Sixth Circuit noted that "[t]he import of this perpetual postponement and the applicability of these cap letters to the current parties are fact issues that must be resolved by the district court . . . " *Id.*

In *Cole v. ArvinMeritor, Inc.*, 516 F. Supp. 2d 850 (E.D. Mich. 2005), the court held as follows:

> These cost-controlling caps are future oriented, and govern retiree health costs for decades after expiration of the agreements in which they appear. The only reasonable conclusion is that the agreements intend that both pension and retiree health benefits are to continue for the lifetimes of retirees, eligible dependents, and surviving spouses.

*Id.* at 870. Despite the fact that *Cole* was decided when *Yard-Man* was still good law, the logic behind this statement remains very persuasive.

Notably, when asked whether Honeywell's actuaries calculated the future cost of retiree healthcare benefits based on an understanding that those benefits would be provided for the lifetime of each retiree, Warren could not answer the question. Trial Tr. at 305-06. He explained only that Honeywell agreed to extend the effective date of the caps because, again, it "met our full financial parameters." *Id.* at 289.

27

For the reasons explained above, the Court finds that the cap provision provides further evidence of the parties' understanding that retirees had lifetime healthcare benefits. Even stronger evidence of that understanding, however, arises out of the parties' negotiations for the 2011-2014 CBA.

### F.    2011 Negotiations

Early in 2011, Honeywell announced plans to sell the Greenville plant to the Rank Group. That sale was not going to be completed until July 29, 2011. Nevertheless, the 2008-2011 CBA was set to expire in May of 2011. Employees were given the choice of negotiating a new CBA with Honeywell or with Rank. They chose to negotiate with Honeywell. Trial Tr. at 160-61.

Rick Hancock, Honeywell's Human Resources Manager for the Consumer Product Group at the Greenville plant, was Honeywell's lead negotiator in 2011. Hancock Dep. at 12-13, 26, 61; Trial Tr. at 227. Becky Silcott was his personnel administrator. Hancock Dep. at 12. After the property was sold, Hancock joined the Rank Group as the Human Resources Director. *Id.* at 13-14.

Hancock testified that, based on his conversations with Silcott and with Buzz Fink, he understood that Greenville's retirees had vested healthcare benefits, and that they would continue to receive those benefits until they died. *Id.* at 45-46, 48, 52. He further testified that his belief was consistent with the CBA provisions that promised that Honeywell would pay the full cost of retiree healthcare, and then "*upon the death of a retiree*, the Company will continue

28

coverage for the spouse and dependent children for their lifetime. . . " *Id.* at 46-47, 66 (emphasis added).

Honeywell argues that Hancock's understanding that Greenville retirees had lifetime healthcare benefits was flawed. He had no first-hand knowledge of the parties' intent because he did not participate in previous negotiations at the Greenville plant. *Id.* at 83. Moreover, he never communicated his understanding of the lifetime nature of retiree healthcare benefits to Warren or Bocik. *Id.* at 82-83. The Court notes, however, that Hancock's understanding is entirely consistent with that of Mike Rihm and all members of the UAW bargaining team who had participated in the negotiations for the 2000-2003 CBA, eleven years earlier.[15] More importantly, Hancock's understanding that retiree healthcare benefits were vested provides the backdrop for what occurred during negotiations for the 2011-2014 CBA.

In 2011, there were approximately 175 UAW-represented employees at the Greenville plant. *Id.* at 20. Honeywell had a two-tier wage system. All of the Greenville employees were tier-one employees, which meant that they were paid at a higher rate. *Id.* at 23-24. One of the goals during the 2011 negotiations was to reduce labor costs by replacing the number of tier-one employees with tier-two

---

[15]    The Court notes that Rick Hancock and Mike Rihm both worked as human resource managers at the local Greenville plant. The fact that, although they never met each other, Hancock Dep. at 18, they both understood retiree healthcare benefits to be vested, lends credibility to Plaintiffs' claims.

employees. This was to be accomplished, in part, by encouraging tier-one employees to retire. *Id.* at 30, 62-63.

To save costs, Honeywell also planned to eliminate subsidized healthcare benefits for all employees who retired after June 1, 2011. *Id.* at 26-27, 32-33, 73; Trial Tr. at 159. When Hancock communicated this to Fink, then president and chairperson of the local, and the UAW's lead negotiator, Fink vehemently objected. He told Hancock, "there's no way I'm going back to this membership and telling them they're going to lose their healthcare two weeks after this contract is signed." Trial Tr. at 158-159, 177. Fink explained to Hancock that it was not right for Honeywell to take this lifetime benefit away from future retirees. Hancock acknowledged that it was a lifetime benefit, but told Fink that "it cost the company a lot of money." *Id.* at 161-62.

Ultimately, the parties negotiated a one-year window of opportunity. *Id.* at 159-160. All employees who retired on or after June 1, 2012, would have to pay 100% of the cost of healthcare coverage. JX18, at GR001058. However, if they retired before that date, they would be able to keep their company-paid lifetime retiree healthcare benefits. Hancock Dep. at 36, 47-48, 50. Said benefits would be provided either by Honeywell or by the Rank Group, depending on whether the employee retired before or after the date of the sale. Trial Tr. at 295. Approximately 70-80 of the 175 employees took advantage of this window of opportunity, and retired before June 1, 2012. Hancock Dep. at 27-29. Continued access to lifetime healthcare coverage was the only incentive that they were given

30

to retire before that date, during the "window of opportunity." *Id.* at 32, 36, 47, 62-65, 67, 69.

The parties' understanding that the retirees had *lifetime* healthcare benefits formed the premise behind the creation of this window of opportunity. It is inconceivable that nearly half of the union employees at the Greenville plant would agree to voluntarily retire based solely on a promise that they would continue to receive healthcare benefits only until May 22, 2014, when the CBA expired. Accordingly, evidence of what transpired during and after the 2011 negotiations provides additional support for a finding that the parties intended that Honeywell would provide lifetime retiree healthcare benefits.

### G.    Post-2014 Course of Conduct

Despite Honeywell's insistence that any obligation to provide retiree healthcare benefits expired on May 22, 2014, when the final CBA expired, it is undisputed that Honeywell continued to provide such benefits for more than two years after that date. Only after the Supreme Court issued its 2015 decision in *Tackett* did Honeywell reassess its position concerning its obligation to continue providing retiree healthcare benefits. *See Kelly v. Honeywell Int'l, Inc.*, No. 3:16-cv-543, 2017 WL 522163, at *6 (D. Conn. Feb. 8, 2017) (noting that corporate counsel spent several months re-evaluating CBAs after the *Tackett* decision was issued.). On December 28, 2015, Honeywell sent a letter to all retirees of the Greenville plant, notifying them of Honeywell's intent to terminate all retiree healthcare coverage as of December 31, 2016. JX48.

31

Honeywell's course of conduct in continuing to provide coverage after the CBA expired provides strong support for the Court's finding that Honeywell agreed to provide lifetime retiree healthcare benefits. *See Brooklyn Life Ins. Co. v. Dutcher*, 95 U.S. 269, 273 (1877) ("The practical interpretation of an agreement by a party to it is always a consideration of great weight. . . There is no surer way to find out what parties meant, than to see what they have done."); *Alabama v. North Carolina*, 560 U.S. 330, 346 (2010) (noting that the parties' "course of performance" is "highly significant" evidence of their contractual intentions).

Moreover, numerous courts have held that when a for-profit company continues to pay for healthcare benefits after it is no longer contractually obligated to do so, this suggests that the parties intended the benefits to be vested. *See e.g., Weimer v. Kurz-Kasch, Inc.*, 773 F.2d 669, 676 n.6 (6th Cir. 1985); *UAW v. Skinner Engine Co.*, 188 F.3d 130, 144 (3d Cir. 1999); *Bower v. Bunker Hill Co.*, 725 F.2d 1221, 1225 (9th Cir. 1984); *USWA v. Connors Steel Co.*, 855 F.2d 1499, 1502 (11th Cir. 1988).

Notably, neither Ed Bocik nor Eric Warren had any explanation for why Honeywell continued to provide retiree healthcare benefits after May 22, 2014. Trial Tr. at 236, 238, 295-96. The most likely explanation is because Honeywell believed that it was required to do so.

Honeywell argues that it should not be punished for failing to immediately terminate benefits when the CBA expired. Just because it had a right to do so,

does not mean that failure to exercise that right constitutes a waiver. Honeywell notes that, in *Gallo*, the Sixth Circuit stated:

> [A] company does not act inconsistently when (1) it continues paying healthcare benefits to retirees and (2) reserves the right to alter or eliminate those benefits in the future. That a company to its credit hopes to subsidize healthcare benefits for its retirees for as long as possible does not mean it has promised to do so, and above all such action does not mean that it has no right to alter those benefits in the future . . .

*Gallo*, 813 F.3d at 274. However, because the CBAs at issue in this case contain no reservation-of-rights clause, *Gallo* is factually distinguishable. Moreover, because the court in *Gallo* found that the contract language was unambiguous, it had no occasion to consider extrinsic evidence such as the company's course of conduct.

Honeywell also relies on *Watkins v. Honeywell International, Inc.*, No. 3:16-cv-1925, 2016 WL 7325161, at *6 n.8 (N.D. Ohio Dec. 16, 2016). However, *Watkins* actually supports Plaintiffs' position. There, as here, the plaintiffs argued that Honeywell's conduct in continuing to provide benefits after the CBA expired manifested its intent to provide lifetime benefits. The *Watkins* court noted, however, that because it did not find the CBA to be ambiguous, it could not consider any extrinsic evidence, including Honeywell's course of conduct. *Id.* Here, however, because this Court *has* found the CBA to be ambiguous, it may consider extrinsic evidence, including Honeywell's course of conduct, to resolve the ambiguity. In the Court's view, Honeywell's conduct in continuing to provide healthcare benefits after it was, allegedly, no longer contractually obligated to do

so is an objective manifestation of the parties' earlier intent to vest lifetime retiree healthcare benefits.

## II.    Findings of Fact

The Court's findings of fact are as stated in the previous section of this Opinion and Order.

## III.    Conclusions of Law

Plaintiffs have proven, by a preponderance of the evidence, that Honeywell agreed to provide lifetime healthcare benefits to its retirees at the Greenville, Ohio, plant. Honeywell's plan to terminate those benefits as of February 28, 2017, therefore breaches the terms of the relevant collective bargaining agreements. Accordingly, pursuant to Section 301 of the LMRA, 29 U.S.C. § 185, and ERISA, 29 U.S.C. § 1132, Plaintiffs are entitled to the relief requested.

## IV.    Conclusion

For the reasons set forth above, Honeywell is permanently enjoined from terminating healthcare benefits for putative class members who retired from the Greenville, Ohio, plant before June 1, 2012, and for their eligible spouses and

dependents. No changes to those benefits shall be made without further order of this Court.[16]

Judgment shall be entered in favor of Plaintiffs and against Defendant Honeywell.

The captioned case is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton. Nevertheless, the Court retains jurisdiction over any post-judgment matters and issues of implementation and enforcement of the Court's judgment and permanent injunction.

Date: February 28, 2017

WALTER H. RICE
UNITED STATES DISTRICT JUDGE

---

[16] Although Plaintiffs' Complaint also seeks damages, the Court notes that Plaintiffs have submitted no evidence concerning damages; all relief requested at the evidentiary hearing was prospective. The Complaint also asks for costs and attorney fees. Plaintiffs may file a post-judgment motion for such relief, if otherwise available.

35